## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for HILLCREST BANK, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:10-CV-3666-TCB |
| v. | ) ) | |
| BRYAN CAVE LLP, | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

### MEMORANDUM OF LAW OF AMICUS CURIAE
### AMERICAN ASSOCIATION OF BANK DIRECTORS IN SUPPORT
### OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Amicus Curiae American Association of Bank Directors ("AABD"),

by counsel, respectfully submits this memorandum of law as amicus curiae

in support of the Motion for Summary Judgment filed by Defendant Bryan

Cave LLP ("Bryan Cave").

### STATEMENT OF AMICUS INTEREST

AABD is a non-profit organization that represents the interests of

directors of banks and savings institutions.  Founded in 1989, AABD is the

only trade group in the United States devoted solely to bank directors and

their information, education, and advocacy needs.  In response to a

significant increase in the number of bank closures over the past several years and the high number of investigations and related lawsuits that the Federal Deposit Insurance Corporation ("FDIC") has initiated against bank directors, AABD has established the Bank Director Liability Resource Center to serve as a clearinghouse for developments in these areas.

The issues before the Court in this case will have significant public policy and legal impact on issues vitally important to AABD's membership. The FDIC's lawsuit against Bryan Cave is an attack not on lawyers, but rather on outside directors of community banks – those who serve as independent directors, who are usually paid small director's fees, who are most often not professional bankers, and who are exposed to ruinous liability when a bank fails because of the financial and liquidity crisis not of their making that has decimated community banks nationwide.  These directors are most often the small business men and women of small town America— nonbankers who are the realtors, doctors, pharmacists, teachers, and leaders of their community and who often mainly serve in order to support the availability of credit in their community.

During the S&L crisis of the late 1980s and early 1990s, most of the banks and savings institutions that failed were community banks, and most of the lawsuits filed against outside directors by the FDIC and the RTC were

against directors of community banks in towns like Cornelia, Georgia,

(population 8,303), Estherville, Iowa (pop. 6,720), and Drew, Mississippi

(pop. 2,349).  These are the kinds of banks whose boards of directors still

approve individual loans, unlike directors of very large institutions – and are

now being challenged as to whether those loans should have been approved,

based on the hindsight of reviewing every shred of paper relating to such

loans and with the luxury of many weeks' review, unlike community bank

directors with limited time to review the work of their loan officers given the

business need to process loan applications expeditiously and the volume of

loans required to be reviewed.  We are beginning to see the replay of history

in that all of the recent suits filed so far by the FDIC against outside

directors have been against directors of community banks.  These directors

have little resources with which to fight against the Federal Government and

its virtually limitless resources to extract settlements from these directors,

and having insufficient access to bank records will make the odds even

longer.

    The AABD's interest in this matter is to advocate for a just resolution

of the parties' differences that is consistent with existing law and public

policies governing the rights of directors of failed banks.  AABD thus has

respectfully submitted this brief in support of the Defendant's motion for

summary judgment and asks this Court to clarify that, as a general matter, bank directors have a right to hold and access copies of bank documents that they need to defend themselves in bank failure-related lawsuits[1] by the FDIC and others.

## ARGUMENT

### I.   FDIC-Receiver Investigations and Litigation Create a Need for Board Members to Access Records of Failed Banks.

#### A.   The Process of FDIC-Receiver Investigations and Litigation.

When regulators close a bank, the FDIC as receiver becomes the party-in-interest to pursue claims against the bank's management, members of its board of directors, and other institution-affiliated parties for losses caused by conduct amounting to fraud, intentional misconduct, gross negligence, and, in some cases, simple negligence.[2]  Upon appointment as receiver of a failed bank, the FDIC immediately seizes the bank's records and begins a formal inquiry into reasons for the bank's failure, which typically include (i) an assessment of the actions of the bank's officers and directors, and (ii) the transmission of a demand and/or notice of circumstances letter to the bank's directors and/or director and officer

---

[1]   AABD takes no position with respect to the applicability of privacy law and regulations.

[2]   *See* 12 U.S.C. §§ 1821(d)(2)(A)(i).

liability insurance carrier regarding the inquiry and advising that potential liability claims might exist – often for many millions of dollars.[3]

The formal inquiry that the FDIC conducts, which proceeds according to a process that dramatically favors the interests of the FDIC vis-à-vis the former directors and officers of the bank, presents a formidable challenge to bank directors.  For example, unlike a private plaintiff, the FDIC may depose and issue document subpoenas to bank directors, officers, and employees before filing a lawsuit.  These subpoenas, which are extremely broad in scope, often seek personal financial information about each former director and officer.  When they do, such subpoenas are colloquially referred to as "deep pocket subpoenas" as the only conceivable purpose for the FDIC obtaining personal financial information is to determine whether a given director or officer is worth suing—a power a private litigant lacks absent a court order predicated on certain stringent factual determinations.[4]

At some point in every investigation, the FDIC, often with assistance from outside fee counsel, makes a recommendation to the FDIC Board of Directors on whether to authorize a suit.  Directors and other targets are not

---

[3]       *See* Samuel J. Buffone, *Representation of Officers and Directors in FDIC Investigations and Lawsuits*, 1848 PLI/Corp 419, 421 (2010).
[4]       *See id.* at 423; 12 U.S.C. §§ 1818(n), 1821(d)(2)(I); *see also* 12 C.F.R. § 308.146.

afforded the right to make a presentation to the FDIC Board of Directors.  If

the FDIC Board of Directors authorizes a suit based on the record that only

FDIC personnel and outside fee counsel creates and presents, the FDIC

informs any targeted directors and officers they may settle all potential

claims or be sued.  During the past 25 years, the FDIC has sued or settled

with bank board members and/or management in approximately 24% of all

bank closures.[5] Once the FDIC authorizes a lawsuit, directors and other

institution-affiliated parties face an implacable adversary with virtually

unlimited resources; few escape unscathed.

Aware of this litigation exposure and of the FDIC's historic refusal in

many instances, during the S&L crisis and its aftermath, to allow directors

and their counsel access to documents following a bank's closing, some

directors and their counsel have realized a need to copy and preserve

corporate records before their bank closes.  Recent correspondence from the

FDIC has done little to mollify these concerns: in its January 25, 2011 letter

to the AABD, the FDIC, per its then Acting General Counsel, does not

assure access to bank records, but instead only states that there is a

willingness to "accommodate" such requests in "appropriate" circumstances,

---

[5]      Statement Concerning the Responsibilities of Bank Directors
and Officers, available at http://www.fdic.gov/regulations/laws/rules/5000-
3300.html.

without defining either term and leaving the matter solely subject to the FDIC's discretion.[6]  That process is no substitute for the director's ability to preserve copies of relevant records prior to closure.[7]

For directors and officers of failed banks who must operate within the limits of the FDIC's relatively one-sided process and who face substantial monetary, reputational, and other risks from their exposure to that process, the only way they can influence the FDIC Board of Directors' decision on whether to sue them is to present evidence – either informally or by sworn testimony – to FDIC staff lawyers and/or outside fee counsel before any recommendation is submitted to the FDIC Board of Directors.  But if directors of failed banks do not have access to the very bank records documenting their actions as directors of the bank because these records

---

[6]     *See* Letter of January 25, 2011 from the FDIC to the AABD, available at http://www.aabd.org/publications/letters/krimminger_fdic_director_suits.html.

[7]     The discovery process set forth in the Federal Rules of Civil Procedure and its state counterparts cannot substitute for the bank director's immediate right of access to all corporate documents, which, among other things, enables them to prepare for the FDIC depositions and present a case to FDIC counsel so that they may be persuaded not to recommend a suit against them.  Courts, moreover, have recognized that the substantive right of access to corporate documents is completely independent from the discovery rules in civil litigation.  *See, e.g., San Antonio Models, Inc. v. Peeples*, 686 S.W.2d 666, 670 (Tex. App.—San Antonio 1985, no writ) (corporation is free to use either or both methods of discovery); *Burton v. Cravey*, 759 S.W.2d 160, 162 (Tex. App.—Houston [1st Dist.] 1988, no writ).

were seized by the FDIC at the time of takeover, they lack the basic tools to establish their lack of culpability.  Their efforts to persuade the FDIC staff and outside fee counsel are limited to their recollection of complex events. The need for access to such records is even more apparent given that the FDIC commonly puts at issue transactions or occurrences dating back many years prior to the bank's failure that typically relate to such matters as bank board approval of individual loans based on the review of detailed loan records by the board and/or loan officers.  The relevant statutory limitations provisions allow the FDIC, as receiver, to pursue claims against directors and officers based on events that occurred many years prior to the filing of a lawsuit.[8]  Memories of details fade, and without full access to relevant bank records, directors will be significantly disadvantaged in their efforts to convince the FDIC Board of Directors that it should not authorize a lawsuit.

**B.      Directors of Failed Banks Presently Have an Acute Need for Access to Bank Documents.**

---

[8]      For example, the FDI Act provides in pertinent part that for tort claims, the FDIC as receiver has the greater of three years from the date the claim accrues or the applicable period under state law.  12 U.S.C. § 1821(d)(14)(A)(ii)(I)-(II).  This time begins to run from the later of the date the receiver was appointed or the date the claim accrued.  12 U.S.C. § 1821(d)(14)(B)(i)-(ii).  Significantly, with respect to tort claims involving alleged fraud or certain intentional misconduct, the FDI Act contains a "Revival" provision which permits the receiver to proceed on claims otherwise barred by state law provided they are barred less than 5 years before the appointment of the receiver.  12 U.S.C. § 1821(d) (C) (i)-(ii).

The right of bank directors to access copies of potentially exculpatory documents from the outset of any FDIC investigation recently has become more critical given the FDIC's aggressive stance in seeking to recoup losses from former bank directors.  With the most recent wave of bank failures – 347 and climbing since January 2008 – the FDIC has initiated a full-court press against bank management.[9]  Between November 2010 and January 2011, the FDIC authorized lawsuits against over 100 officers and directors at failed banks seeking to recoup over $2.4 billion in losses from them.[10]

The stakes in these matters can be very high.  Bank directors may face personal liability in the millions of dollars for their actions as bank board members.  Moreover, many banks that have failed may not have directors and officers insurance coverage for suits that may be brought by the FDIC.

### C.    The FDIC's Complaint Against Bryan Cave.

The FDIC's Complaint against Bryan Cave fails to acknowledge that bank directors have any rights whatsoever to copies of bank records. Specifically, the Complaint states that those directors of Hillcrest Bank who

---

[9]    *See* Failed Bank List, available at http://www.fdic.gov/bank/individual/failed/banklist.html, last visited March 20, 2011.

[10]    *See* Joe Adler, *First the Failures, Then the Lawsuits*, US Banker (July 2010), available at http://www.americanbanker.com/usb_issues/120_7/first-the-failures-then-the-lawsuits-1021272-1.html.

provided copies of bank records to Bryan Cave violated their fiduciary duties by converting bank records "to their own . . . personal and individual possession, use and benefit." This position is extreme and incorrect as a matter of law, and the Court should not accept it.

## II.   As a General Matter, Bank Directors Are Entitled to Access Bank Records Created During Their Tenure.

As set forth in Bryan Cave's summary judgment memorandum of law, bank directors and officers have a right to access and retain copies of bank books and records, and to share those copies with their own counsel, for the entirely legitimate purpose of explaining and defending their own conduct as bank board members when faced with FDIC enforcement proceedings or litigation. (Def.'s Mem. in Support of Summary Judgment, Doc. No. 31 at 3-4). Significantly, there is no federal statute or regulation that prohibits a bank director or officer from accessing bank documents to assist in explaining or defending his or her conduct, and accordingly the issue is governed by state law—here, Kansas law. (*Id.* at 3-4, 10-16.) Under Kansas law, as in many other states, directors have a right to access and copy bank documents, and to share such copies with their counsel for the purpose of mounting a defense. (*Id.* at 3-4.)

Indeed, the bank directors' right of access to all corporate documents during their tenure on the bank's board is absolute and should not be

impeded when the decisions those directors made are called into question after the fact.  That is especially so because bank directors have a fiduciary obligation and are held to a high standard of care relating to their obligation to make informed and prudent decisions concerning the conduct of the bank's affairs.  The review of information relating to the bank's conduct of its affairs is critical to the discharge of this function.  Because bank directors are charged with managing the business and affairs of the institution, it is "axiomatic that the individual director cannot make his full contribution to the management of the corporate business unless given access to the corporation's books and records" and, thus, the right to inspection and access of such records is "absolute."  *Chavco Investment Company, Inc. v. Pybus*, 613 S.W.2d 806, 810 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

The reason behind this rule is simple: to exercise their judgment in performing their fiduciary duties, to protect their institutions and investors from gross negligence or fraud, and to protect themselves from lawsuits, directors must stay fully informed through access to corporate documents so they can monitor corporate operations, set policies and procedures, ask pointed questions, and act reasonably under the circumstances.

Any limitation on a director's access to documents for the purpose of defending him or herself after a bank fails would not only disregard critical public policy considerations that have long been embodied in state "director protection statutes," but also weaken the effectiveness of those same provisions.  These statutes, which every state has enacted, authorize indemnification and advancement of expenses to directors exposed to liability in most situations.  Many state indemnification statutes also include a non-exclusivity clause, which provides that the statutory right to indemnification shall not be deemed exclusive of any other right to which those indemnified may be entitled.  Director protection statutes further permit the expansion of indemnification rights through bylaws, charter provisions, corporate resolutions, or agreements.  They also generally authorize a corporation to purchase insurance against any liability that could be asserted against a director in his or her capacity as director or arising out of his or her status as such, whether or not the corporation would have the power to indemnify the director against such liability.

A number of states have also enacted statutes that allow the board to limit a director's liability under certain circumstances for monetary damages

through provisions in the corporate bylaws.[11]  Specific to directors and officers of financial institutions, after the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was enacted, some states also enacted statutes that establish gross negligence or equivalent conduct as the standard of liability for directors and officers of financial institutions.[12]

Director protection statutes promote a number of policy objectives. By reducing the risk of personal liability, they encourage individuals to serve on corporate and bank directorates.  Director protection statutes recognize inherently that directors act in their corporate – not individual capacity – in furtherance of their fiduciary duties, and, thus, should be empowered to defend those corporate actions, as needed.

Thus, for director protection statutes, whether specific to bank directors or otherwise, to have any real value, directors must be able to access the corporate documents needed.  Without such documents they cannot, as the terms of the statutes require, establish that they meet the legal requirements for indemnification (whether at law, under corporate documents, or under the relevant insurance policies).  Moreover, denying

---

[11]     *See, e.g.*, N.J.S.A. § 17:12B-38.1 (West 2000) and 15 Pa. C.S.A. § 513 (West 1995).

[12]     *See e.g.*, Okla. Stat. Ann. Title 6, § 712 (West 2001); La. Rev. Stat. Ann. § 6:291 (West 2005); Miss. Code Ann. § 81-5-105 (West 1999).

bank directors access to bank documents for the purpose of defending themselves would confer upon the FDIC in cases like the instant action an enormous litigation advantage, one that would create significant disincentives to bank board service.

Finally, and most importantly, the director protection statutes spotlight an inherent flaw in the FDIC's reasoning in this case: namely, that somehow a bank director's use of bank documents to defend him or herself from suit is a "personal and individual interest[]." This is simply not true. As the statutes show, directors act *and* defend themselves in their corporate capacity. The FDIC's efforts to deny directors access to the records that they most need to defend their corporate actions simply does not align with the purposes of these director protection statutes, or, for that matter, the entire corporate scheme.

## III. Bank Directors Are Entitled to Access Bank Records Relevant to Their Defense Post-Bank Failure.

### A. Receivership Does Not Alter Bank Directors' Rights to Access Documents for the Proper Purpose of Defending Against Investigations and Lawsuits.

The bank director's right of access is not, as the FDIC advocates, somehow extinguished by the closure of the bank and the placement of the bank in FDIC receivership. Rather, post-failure, this right of access survives and becomes a qualified right that permits directors access to the documents

for a proper purpose such as mounting a defense to FDIC charges regarding their conduct.[13]  This right is critical because, without access to the documents supporting the decisions made, directors may be unable to ward off an ill-conceived or unjustified FDIC lawsuit.

Although bank directors and officers have every legitimate interest in obtaining copies of bank documents necessary for their defense, the FDIC has no legitimate cause to oppose such access.  Director and officer access does not deprive the FDIC of any information—on the contrary, it improves the FDIC's access to documents because the originals are preserved and, in addition, the copies are secured and available to be subpoenaed.

Moreover, the FDIC's extreme position in this matter is belied by its conduct in other circumstances where it is in the FDIC's interest to disclose even the most sensitive, confidential bank documents.  For example, the FDIC permits full access to bank documents by potential bidders for failed bank assets, subject to execution of a confidentiality agreement protecting

---

[13]     *See People ex rel. Spitzer v. Greenberg*, 851 N.Y.S.2d 196, 199 (N.Y. App. Div. 2008); *State ex rel. Oliver v. Soc'y for the Preservation of the Book of Common Prayer*, 693 S.W.2d 340, 343 (Tenn. 1985) (noting that right of access continues upon removal if director "has been or may reasonably be charged with some act or failure to act during his incumbency for which he might be held personally responsible"); *Cohen v. Cocoline Products*, 127 N.E.2d 906, 908 (N.Y. 1955) (former director has qualified right to inspect corporate records where "inspection is necessary to protect his personal responsibility interest").

the documents.  Similarly, when the Inspectors General of the FDIC,

Treasury and the Board of Governors of the Federal Reserve System issue

reports on failed banks, they recite bank examination history that the FDIC

claims is highly confidential.  In its recent lawsuit against directors of 1st

Centennial Bank, the FDIC as receiver for the failed bank attached as

Exhibit A to its Complaint a copy of a confidential report of examination

that had detailed write-ups of loans to named borrowers and guarantors with

detailed personal financial information.  *See FDIC as Receiver of 1st*

*Centennial Bank vs. Appleton, et al.,* Case No. 2:11-cv-00476-DDP-PLA

(C.D. Ca. Filed Jan. 14, 2011).  If the FDIC discloses such information in

furtherance of its business and litigation interests, disclosure should be no

less permitted when necessary to protect the statutory rights of directors

forced to confront the FDIC.  Given this inconsistency, the apparent and

somewhat obvious goal of the FDIC's lawsuit against Bryan Cave, therefore,

is not to protect the FDIC's access to information, but rather to impair the

ability of individuals faced with FDIC enforcement proceedings or litigation

to present an informed defense so that the FDIC Board of Directors will not

authorize the suit.

To the extent concerns exist regarding the handling, post-receivership,

of bank documents by the directors, such concerns may be alleviated or

eliminated through the use of a confidentiality agreement or protective order.

Indeed, in its January 25, 2011 letter to the AABD, the FDIC stated that it

recognizes the interests of bank directors in accessing bank records after a

bank failure but before any enforcement action or litigation commences.

The FDIC further stated that it "ha[s] been and will remain willing to

accommodate these interests where appropriate, provided that any

information furnished to the interested party is made subject to . . . a suitable

confidentiality agreement or protective order."[14]   Although the FDIC's letter

acknowledges that its concerns about confidentiality can be addressed

sufficiently by a "confidentiality agreement" or a protective order, the FDIC

offered neither in this case.   Nor does the record reflect any attempt by the

FDIC to negotiate with Defendant, as the bank directors' counsel, to

alleviate the FDIC's confidentiality concerns.

Indeed, to require that all such documents be returned post-seizure

without even an attempt to protect legitimate interests through a protective

order makes transparent that the only interest the FDIC is advancing by

---

[14]      *See Letter of January 25, 2011 from the FDIC to the AABD*,
available at
http://www.aabd.org/publications/letters/krimminger_fdic_director_suits.ht
ml.  Notably, the letter expressly refers only to post-failure rights of access,
in contrast to this case, involving a director's right to access and copy
documents before failure to aid in their defense in threatened claims by the
FDIC, as set forth in Defendant's Motion for Summary Judgment.

suing for the return of such records is an intent to severely impede the ability of bank directors to document the exercise of their fiduciary duties in any lawsuit brought by the FDIC-Receiver.

This is especially true when the FDIC challenges decisions made years before the bank's closure about which memories almost certainly have faded.  In the early 1990s, for example, some complaints filed by the Resolution Trust Corporation ("RTC"), which served a similar function for failed S&Ls, alleged that directors breached their fiduciary duties by approving loans more than ten years prior to the date of the complaint. AABD's seminal study on the RTC's 1992 lawsuits, *RTC Suits against Savings Institution Directors and Officers – Are they in the Public Interest?* (1995) ("RTC Suit Study"), reported that the RTC routinely barred directors from accessing key bank records during the investigative phase of the case, and only acceded to document requests after the court ordered it to do so following the filing of a lawsuit.  But this precluded directors from access to bank records that might have allowed them to convince the RTC not to file a suit in the first place.

In contrast, through its subpoena power, the RTC had free access to any bank records in the possession of the directors as well as to the directors' personal financial records and was able to depose directors

without showing them the records needed to refresh their memories.  This one-sided process was made worse by the use of tolling agreements which prolonged the statutes of limitations for suits against directors of failed institutions.  The RTC represented that if a director did not agree to toll the statute of limitations, it would file suit.  When a director did agree, the RTC retained the right to file suit for an extended period, allowing the RTC time to strengthen its case, while the director – who remained without access to the bank files – was placed at an even greater disadvantage as his or her memory continued to fade.  Similarly, in this case it appears that the express purpose of the FDIC's position is to ensure that directors are unable to effectively persuade the FDIC Board of Directors not to sue them.

> **B.    Failure to Safeguard Bank Directors' Rights to Access Documents Post-Receivership Will Deter Board Service.**

In light of the significant personal liability exposure confronting bank directors, the FDIC's policy will only diminish substantially the pool of qualified and conscientious individuals willing to serve as bank board members at a time of financial challenges for many banks when qualified directors are desperately needed.  The FDIC has expressly recognized the importance of being able to attract able and diligent bank directors.  In the FDIC's *Statement Concerning the Responsibilities of Bank Directors and Officers*, the FDIC stated that

> Banks need to be able to attract and to retain experienced and
> conscientious directors and officers.  When an institution becomes
> troubled, it is especially important that it have the benefit of the
> advice and direction of people whose experience and talents enable
> them to exercise sound and prudent judgment.[15]

During the S&L crisis of 20 years ago, when more than 1,800 banks

and savings institutions failed and the FDIC and the RTC (which at that time

acted as receiver for failed savings institutions) authorized numerous suits

against directors of failed institutions, the AABD conducted a survey of

banks and bank directors to determine the effect that these suits and

threatened suits had on the willingness of persons to serve as bank directors.

During that period, AABD's survey results were that approximately 20% of

U.S. banks either had a director resign over fear of personal liability or had a

person refuse to accept an offer to serve as a director for that reason.

It is a fact that the overwhelming number of directors sued during and

after the S&L crisis and in recent months have been directors of community

banks.  These directors typically receive fees and other compensation that

are modest by any standards.  It will not take much to convince a bank

director of a community bank that the risks exceed the rewards.

---

[15]     *See Statement Concerning the Responsibilities of Bank
Directors and Officers*, available at
http://www.fdic.gov/regulations/laws/rules/5000-
3300.html#5000statementct (last visited March 18, 2011).

The FDIC's recent aggressive stance regarding bank director liability and its disregard of state law and related public policy considerations that require a right of access to bank records, including potentially exculpatory records, pose a significant deterrent to serving as a bank director. By contrast, allowing directors access to documents relevant to transactions that might have occurred many years ago would allow the FDIC to obtain critical information regarding whether to proceed with a potentially ill-advised suit. Indeed, the FDIC should want directors to have access to these documents so that pre-suit depositions are actually fruitful and informative, providing the FDIC all of the relevant information it needs to reach an informed judgment.

In light of the foregoing considerations, the AABD has urged the FDIC to announce publicly that, in pertinent part, (i) when the FDIC issues a demand letter to a director of a failed bank, the director will be advised that he or she is entitled to obtain copies of or review bank files from the FDIC under any appropriate confidentiality restrictions, and (ii) Bank directors may at any time obtain, possess, and retain copies of any bank records under appropriate confidentiality restrictions and may retain such bank records

following the closing of their bank, subject to such confidentiality restrictions.[16]

## CONCLUSION

For the foregoing reasons, AABD respectfully requests that this Court grant Defendant Bryan Cave's motion for summary judgment and enter judgment in favor of Defendant on all counts.

Respectfully submitted,

/s/ Anthony L. Cochran

Anthony L. Cochran
Chilivis Cochran Larkins &
Bever, LLP
3127 Maple Drive, N.E.
Atlanta, GA 30305
Tel. 404.233.4171

Samuel J. Buffone
Victoria Holstein-Childress
BuckleySandler LLP
1250 24th Street, N.W.
Washington, D.C. 20037
Tel: 202.349.8000
sbuffone@buckleysandler.com
vholstein@buckleysandler.com

---

[16] December 22, 2010 Letter from AABD to S. Bair, available at http://aabd.org/downloads/Bair_FDIC_Director_Suits.pdf.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2011 Amicus Curiae American

Association of Bank Directors filed the foregoing document electronically.

Notice of this filing will be sent to the parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's

system.

/s/ Anthony L. Cochran
Anthony L. Cochran
*Attorney for Amicus Curiae*
*American Association of Bank*
*Directors*